[No. 2986. Jan. 4, 1928.]

CALIFORNIA SUGAR & WHITE PINE CO.
v. WHITMER JACKSON & CO.

[263 Pac. 504.]

Marron & Wood, of Albuquerque, for appellant.

Reid, Hervey & Iden, of Albuquerque, for appellee.

OPINION OF THE COURT

BICKLEY, J. Plaintiff (appellant) sued defendant (appellee) for damages for breach of contract to purchase lumber, to be delivered at Albuquerque, N. M., in weekly installment shipments, commencing in the early part of July, 1920, and to proceed at the rate of one carload a week, 32 weeks being required to complete the deliveries and allowing for time in transit. The contract could thus have been fully performed in February, 1921. This construction was invited by plaintiff and was liberal to it and is not complained of.

Appellant makes no complaint here as to the court's instructions to the jury.

According to the statement of facts as given by the plaintiff, before the time arrived for the delivery of the lumber, the defendant attempted to cancel the contract,

without any legal excuse, and refused to carry it out or comply with its terms on its part. The plaintiff declined to assent to a cancellation of the contract and offered and tendered performance on its part and held itself in readiness to perform during the time specified in the contract, and the sole question for trial and submitted to the jury was the amount of damages the plaintiff was entitled to recover. Appellant claims that it was established and we assume that there was no market for lumber at Albuquerque, the place fixed for delivery, and that the nearest available and effective market was in the state of California, and the market value was therefore to be determined by the market price and conditions in California, taking in consideration the freight rate to Albuquerque. The plaintiff also contended that when the time arrived for the fulfillment of the contract on its part and during the period of time fixed for the delivery of the installments, a great depression in the lumber trade and industry existed in the state of California, and throughout the country, with most other industries, at the time, to such a degree that the lumber market was demoralized and did not exist, so that it was impossible to go into the open market or any market available and find a ready, or practically any, sale for the lumber; that in order to dispose of the lumber, it was necessary to make a continued effort during a long period of time, and that in pursuance of such effort used by the defendant, the lumber was not in fact disposed of and could not have in the exercise of due and reasonable diligence been disposed of for more than a year after the time fixed for the delivery; and that in the meantime the prices and demand steadily declined and the buying market continued to shrink, until toward the end of the period when lumber could be sold at all, it was for less than one-half the price fixed by the contract.

This contention of the plaintiff was denied by the defendant, who asserted that there was an ample existing market for lumber at the time at which the plaintiff could and should have sold the lumber at a price as much, or more, than that fixed in the contract. The contract, as construed by the court, permitted the plaintiff to ship the lumber in 32 weekly installments, which, commencing in

early July, 1920, would carry the time for delivery into the following February. The court considered that a reasonable time thereafter should be allowed within which market conditions could be consulted in determining the market value of the lumber at the times fixed for delivery, and fixed April 1st as limiting the period for such inquiry—later times being too remote. By ten assignments of error, the appellant presents its chief contention that the court erred in excluding evidence offered by it to show its efforts to sell the lumber at subsequent more or less remote dates and the prices obtained therefor. Appellant says the question is most nearly presented by its assignment of error No. 2, from which we hereafter quote its theory of the tender of the evidence in question.

One of the instructions given by the court at the request of the plaintiff is as follows:

"The ordinary rule of damages where a purchaser has refused to accept goods which he had bought and agreed to pay for is the difference between the contract price and the market value of the goods at the time and place fixed for delivery; and in cases like the present where the goods were to be delivered in installments, you should find and determine the market value of each installment or carload of the lumber at Albuquerque in accordance with the terms of the contract; and the difference between that sum and the contract price, if the market value be less than the contract price, would be the damages upon that installment and the sum of the damages upon all the installments ascertained and computed in the same manner would be the amount of plaintiff's damages."

It is the contention of the appellant that as there was no effective California market during the period in which the contract could be performed, and that as the plaintiff, exercising reasonable diligence through an effective sales organization, was unable to dispose of the lumber purchased by defendant until some time in September, 1921, it should have been permitted to introduce evidence of the sales of the lumber contracted for and the prices obtained therefor subsequent to April 1, 1921, and up until the time all of such lumber had been disposed of.

In Mechem on Sales, vol. 2, § 1618, is a discussion of an election of remedies which the vendor has in case the purchaser breaches the contract as follows:

" 'The vendor of personal property,' it was said in a leading case, 'in a suit against the vendee for not taking and paying for the property, has the choice ordinarily of either one of three methods to indemnify himself: (1) He may store or retain the property for the vendee, and sue him for the entire purchase price; (2) he may sell the property, acting as the agent for this purpose of the vendee, and recover the difference between the contract price and the price obtained on such resale; or (3) he may keep the property as his own, and recover the difference between the market price, at the time and place of delivery, and the contract price.' This choice of remedies has been frequently asserted, and, with perhaps some modification, seems to have become an established doctrine of our law."

Plaintiff did not proceed under election No. 1, and disclaims having proceeded under election No. 2, and declares in its reply brief that it had at no time during the trial advocated that the measure of its damages was the difference between the contract price and the amount received on the sale of the lumber. Plaintiff did contend that its inability to sell promptly broadens the field of inquiry, so that evidence is to be received as bearing upon the value of the goods left on its hands, which evidence would be, ordinarily, too remote.

The theory upon which the offer of evidence was made is shown by the following tender:

"We offer to show prices at which sold, running on until about the month of September, 1921, when the last of it was sold, both as showing a measure of damages and also as evidence from which the market value, used in the sense of actual money value, of the lumber was during the respective months when these shipments could have been made by the contract."

We suspect that plaintiff by the use of the words, "as showing a measure of damages," may have had in mind the second choice of methods to indemnify itself, as indicated by Mechem on Sales, supra; but, if so, such contention was abandoned, as indicated by the instruction quoted, supra, and such contention is disclaimed here. So, all we have to consider is the admissibility of the tendered evidence as being relevant to the measure of damages as announced in said instruction.

In Williston on Sales (2d Ed.) p. 1376, it is said:

"These damages are the difference between the contract price and the market price at the time and place when the performance should have been made by the buyer. The object of the resale in

such a case is to determine what that market price in fact was. Unless the resale is made at about the time when performance was due, it will be of slight probative force, especially if the goods are ·of a kind which fluctuate rapidly in value, to show what the market price actually was at the only time legally important."

Appellant contends that where there was no market for the goods at the time the buyer was obliged to accept them, evidence could be introduced as to the price for which the goods sold, to determine the value thereof, even though the resale is of a time subsequent to the time performance should have been made by the buyer. Even if this is so, it became a preliminary question for the court to determine whether as a matter of fact there was an absence of a market at the time the contract was to be performed by the buyer. Some courts hold that finality as to the court's findings of fact upon which the admissibility of evidence depends is conceded to the trial judge; others, that his exercise of a legal discretion may be appealed from, and examined by the appellate court, to determine whether such discretion has been abused. Even if the latter is the correct rule, which we do not now decide, we are unable to say, after an examination of the record, that the trial court abused its discretion in the determination of the preliminary question of fact, upon which depended the admissibility of the evidence offered, and therefore find no error in its rejection.

 Appellant also challenges the action of the trial court in receiving in evidence excerpts from the Timberman, as follows:

"Exhibit D-59: 'California Pine Market.' 'The demand· for pine box lumber continues strong in California on a basis of about $42.00. Shook is selling around $65.00. The supply of shop is low and up to the saw. It is used as fast as it can be produced. No. 1 shop F. o. b. mill is quoted from $90.00 to $92.00, with No. 2 shop at $10 less.'

"Exhibit D-60: 'California White and Sugar Pine. San Francisco, Cal., July 2, 1920. Members of the San Francisco trade who recently checked the available amount of No. 2 shop and better in sugar and white pine declare that not over 15 million feet is available as unsold stocks. On May 1 only 50 per cent. as much pine lumber was piled at 20 mills as on May 1, 1919, it is reported.' And the following is also admitted: 'An advance in California sugar and white pine became effective on July 1. No. 1 and 2 clears advanced $5 and No. 3 clears $3 per thousand. The

demand is strong with very limited stocks. No changes were made in other items.' The rest of the offer is refused."

"In the November, 1920, issue of the Timberman, the offer in the first column on page 81 under the heading 'White and Sugar Pine Situation' is refused. The offer in the second column, page 81, of the same paper, under the heading 'White Pine,' the following will be received: 'Average f. o. b. prices. Average prices f. o. b. a number of representative mills are about as follows: White Pine 5/ and 6/4 No. 1 shop, $90; 5/4 and 6/ No. 2 shop $66.'

"San Francisco Market. [Subheading:] California Pine Prices. The following prices were quoted on October 1 for California white and sugar pine: 5/4, 6/4 No. 1 shop $92; 5/4, 6/4 No. 2 shop $70."

The Timberman is exclusively a trade journal, published in Portland Or., for the lumber trade once each month, and always gives quotations on the market and other information regarding the state of the market as to lumber. It is satisfactorily shown that the Timberman is a reliable journal and is relied upon by the trade in general in dealings and negotiations touching lumber. The four excerpts quoted were from four separate monthly publications of the Timberman, offered for the purpose of showing the state of the market in the respective months of its publication. There were several objections made to the evidence quoted, but the argument of appellant challenging its admissibility presents solely the propositions as illustrated by the authorities he cites, that the introduction in evidence of such publication is not admissible as tending to prove or disprove the issues in this case, and especially not when there is no preliminary showing as to the source from which its information is derived and as to the reliability of the source of information.

The rule governing the introduction of evidence of this character is thus stated in 10 R. C. L. "Evidence," § 367:

"It is a rule recognized generally that market reports or quotations as contained in newspapers, trade journals, trade circulars, price lists, etc., are competent evidence of the state of the market. Indeed, such reports, based as they are upon a general survey of the whole market, and constantly received and acted upon by dealers, are far more satisfactory and reliable than individual entries or individual sales or inquiries; and courts would justly be the subject of ridicule if they should deliberately shut their eyes to the sources of information which the rest of the world relies upon, and demand evidence of a less certain and satisfactory character.

Such evidence is within an exception to the general rule barring the admission of hearsay evidence inasmuch as it comes from a public authentic source which is deemed to give it reliability."

Substantially ·the foregoing is used as a headnote in an annotation to Atlantic Nat. Bank v. Korrick (Ariz.) 242 P. 1009, 43 A. L. R. 1184, where a large number of cases are cited in support thereof.

In support of the contention that such evidence is not admissible without a preliminary showing as to the source from which the information is derived and as to the reliability of such source, appellant cites the foregoing case and a companion case from Arizona, Atlantic Nat. Bank v. Moore, 241 P. 609. These cases are readily distinguishable. It was not shown that the publication there involved was news of the market of which the business and trade world could take advantage, or that it was published for the enlightenment of persons dealing in the articles referred to, nor that persons generally in the habit of dealing in such commodity relied upon its market quotations. The other cases cited are either distinguishable or are out of harmony with the weight of authority. We find no error in the admission of this evidence.

Appellant claims that the court erred in permitting the witness Bernhaur to testify concerning the contents of price lists of the Madiera Lumber Company in effect in the San Joaquin Valley, Cal., during the year 1920, and also receiving in evidence the price lists concerning which the witness testified.

It is urged that at best the lists showed the prices in one locality only in California and did not reflect the general market. Also, that it was not shown that the prices listed were adhered to or represented actual trade conditions. When it is remembered that the plaintiff claimed that while price lists kept up there was no demand at all, and no practical market for any material quantity of lumber after July 1, 1920, and that the demand was spasmodic and unsettled between May and July, 1920, with very few transactions, any evidence showing demand, supply, and prices and actual transactions would be important on the

question of the existence of a market, as well as upon the market prices.

Having seen from the authorities quoted, supra, that price lists are competent evidence of the state of the market, our inquiry as to the evidence objected to is limited to the alleged defects in these particular lists and testimony concerning them. When we consider that the witness had been for years president and manager of a planing mill company that used about 500,000 feet per year (including 1920) of lumber of the character involved, and that practically all of such lumber was bought from the Madiera Lumber Company of Madiera, Cal., "in accordance with their printed price lists published and distributed throughout the San Joaquin Valley," and that the price lists were f. o. b. Fresno and included a freight charge of $1 per thousand, and that the price lists referred to were as low as any other quotations being made for similar stock in that territory, and, taken in connection with the testimony of Colonel Breece that the market price of lumber all over the country is determined by the price of the lumber at the mills, plus freight to the market place, we think the testimony of the witness and the price lists were admissible as tending to show the state of the market.

The following questions and answers appear in the examination of J. M. Farrell, witness for defendant:

"Q. Were you in the market as a purchaser, at the prices such as you were paying, as shown by your testimony and by the billing and Exhibit B-43, for 565,000 feet of shop and better, during the months of June, July, August, and September, 1920? A. I would.

"Q. How would you do that so far as the shipments are concerned? A. Our practice was to accept shipments, two or three cars per week; yet at the time, lumber was so scarce, as a buyer, I wouldn't dictate the deliveries."

Appellant assigns error on account thereof. The objection is that it is speculative as to what the witness could or would have done and that it did not fix the market value in California and that the installments were not available in July.

It appears that Mr. Spaulding, manager of the plaintiff

company, and a witness for it, had testified that plaintiff maintained representatives in various parts of the United States and sold lumber throughout the United States and Canada, and that its representative at Chicago is Louis Wuichet. He also testified that the lumber in question could not have been sold at the rate of four cars per month except at a discount of 25 per cent. to 40 per cent. The witness Farrell had also testified that in June, 1920, the aforesaid Louis Wuichet told the witness that he could no longer care for Farrell's company's needs, as the demand for shop lumber was so great as to make timber scarce and that from June to August, 1920, the witness needed lumber very much and several times told Wuichet that he wanted lumber and Wuichet said he could not furnish it. Defendant offered this evidence to show that the lumber in question was in demand, that it had not declined from the contract price, and to rebut the statement of plaintiff's witness Spaulding, that he had repeatedly tried to sell this lumber and found great difficulty in doing so. Under the circumstances detailed, we see no error in the action of the court in admitting the testimony.

It is next claimed by appellant that it was error to permit the witness, Farrell, to testify to the effect that in August, 1920, he needed lumber badly to keep his factory going and went to Chicago to talk to a lumber broker, named Ruplee, about two cars of lumber that he had heard Ruplee had for sale. The lumber was not in Chicago, but the broker had it for sale, but by the time the witness reached Chicago, about one-half of it was already sold. Appellant objected, on the ground that it was immaterial, that the question did not call for evidence of market value at any time or place affecting the issue in the suit, and that the conditions of the market or the existence of a market in Chicago was immaterial; but that the existence of a market in California was the only criterion which would reflect the Albuquerque market. It is true the court instructed the jury that the market value of the lumber at Albuquerque was to be determined by first ascertaining the market value of the lumber at the mills in California and then adding thereto the freight. But Mr. Spaulding, an officer of plaintiff, had testified

that the market for lumber is all over the United States and Canada. So, while the market value might be fixed as at the mills in California, the market is not limited to that state. Defendant sought to show by this evidence that at one place where plaintiff maintained an office and a representative for the sale of lumber, the demand was greater than the supply, the plaintiff having sought to show the reverse. There was no error in the admission of this testimony.

Appellant claims that the court erred in sustaining objections to questions put to the witness, Ruplee, as to the condition of the lumber market in Chicago during portions of 1920. These questions were contained in the cross-examination of the witness in a deposition taken at the instance of the defendant. The defendant, deeming the deposition of no value to it and beneficial to the plaintiff, did not present it. After the defendant rested, this evidence was offered by plaintiff in rebuttal. It was objected to by the defendant as not being in rebuttal.

The plaintiff had the burden of proving the amount of its damages, and, in the effort to do so, proceeded upon the theory that the lumber market in the latter part of 1920 and early part of 1921 was demoralized and that there was very little demand for lumber; as plaintiff says in its brief in chief: "The principal question at issue before the jury was this question as to the existence of a market, and its character."

Under the familiar and usual rule, the plaintiff, having the affirmative of the issue, shall first introduce all the evidence tending to sustain such issue, and the defendant shall then put in such evidence as is properly receivable to destroy the force of plaintiff's case. So, plaintiff introduced evidence to show little demand and no real market, and defendant then put in evidence to show a heavy demand and a good market; and plaintiff, at the stage of rebuttal, sought to show by the witness lack of demand and a poor market.

The evidence offered is not what is deemed "evidence strictly in rebuttal" or "true rebuttal" as defined by the

law-writers, which plaintiff could put in as a matter of right. It falls within the classification of "evidence not strictly in rebuttal," being merely cumulative or confirmatory of that put in by plaintiff on the original case.

Plaintiff, however, asked permission to introduce the testimony as its affirmative evidence and as part of its case in chief, claiming to have been misled by the action of the defendant in failing to offer the deposition. In such instance, the rejection is within the sound discretion of the trial court. We find no reversible error in having rejected it.

Finally, the appellant says the judgment should be reversed and a new trial ordered, because under the court's instructions the verdict was inadequate. The appellee, on the other hand, says the verdict was very liberal for plaintiff. The evidence is conflicting. This question, however, we will not look into, it being one of fact, and the verdict is conclusive in the absence of prejudicial error on the trial and in the absence of any showing that the jury was affected by passion or prejudice. See Schofield v. Territory, 9 N. M. 526, 56 P. 306; Henderson v. Dreyfus, 26 N. M. 541, 191 P. 442.

Finding no reversible error in the record, the judgment is affirmed and the case remanded; and it is so ordered.

PARKER, C. J., and WATSON, J., concur.